**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | |
|---|---|
| THEODORE KIRKPATRICK; CHRISTOPHER COLL; CHRISTOPHER O'KEEFE; and MICHAEL and DEBBY POPRAWA, h/w; individually and on behalf of all others similarly situated, | CASE NO. 1:16-cv-00733-LY |
| Plaintiffs, | CLASS ACTION |
| v. | JURY TRIAL DEMANDED |
| HOMEAWAY.COM, INC., a Delaware corporation, and DOES 1-10, | |
| Defendants. | |

**PLAINTIFFS' THIRD AMENDED CLASS ACTION COMPLAINT**

Plaintiffs Theodore Kirkpatrick, Christopher Coll, Christopher O'Keefe, and Michael and Debby Poprawa (hereinafter "Plaintiffs"), on behalf of themselves and a proposed class of all others who are similarly situated, submit this Third Amended Class Action Complaint (the "Complaint") against Defendant HomeAway.com, Inc., (hereinafter "Defendant"), and upon information and belief and investigation of counsel, state as follows:

**NATURE OF THE CASE**

1.      This is a class action lawsuit against HomeAway.com, Inc., and encompasses its websites, HomeAway.com, VRBO.com, and VacationRentals.com.  As discussed below, this Complaint seeks damages and other relief arising from Defendant's breach of contract, fraud, and violations of consumer protection laws.

2.      "We are going to be free to travelers . . . . And we're going to be letting everybody know, when you come to our platform and you don't pay a fee and we think that's a big deal."

This was the promise made by HomeAway's CEO and co-founder Brian Sharples regarding Defendant's rental property listing subscription service websites, described in more detail below. This promise was systematically made to rental property owners like Plaintiffs – in fact it was Defendant's mantra. Defendant's website promoted the marketplace model, in advertising as follows:

      a.      "VRBO has no booking fees and is free for travelers."

      b.      "No traveler fees. Free to book with no hidden costs"

      c.      "No fees for travelers. No online booking fees or hidden costs."

Plaintiffs relied upon the promise of no traveler service fees in purchasing and renewing property listing subscriptions with Defendant.

3.      Unfortunately for Plaintiffs and members of the classes (defined below), Defendant has not followed through with this promise, to the great financial detriment of real property owners across the country that pay to use Defendant's services to offer their property for rent.

4.      Defendant, through its various websites, operates the world's leading online marketplace for the vacation rental industry, with sites representing over 1.2 million paid vacation rental listings in 190 countries.

5.      During the relevant time period, Defendant charged homeowners and property managers (hereinafter "owners") annual subscription fees for the right to list and offer short-term vacation rental properties to travelers on one or more of Defendant's websites.  Owners, like Plaintiffs, pay to use Defendant's websites to advertise their vacation properties, to communicate with travelers, and also to access and utilize various booking, tracking and financial tools.

6.      As a vacation rental marketplace, Defendant, through its websites, allowed prospective travelers to rent vacation properties from owners.  Travelers could search Defendant's

websites, locate a vacation property to rent, communicate with the owner of the vacation property, and rent the vacation property.

7.     Defendant induced owners to pay annual subscription fees to list their properties on its websites by representing that it was utilizing a marketplace model.  Under this model, owners paid the costs of listing and renting their vacation properties, while travelers were only required to pay the cost of actually renting the vacation property itself.  Defendant advertised, marketed, and represented to consumers, like Plaintiffs, that it did not charge _any_ fees to travelers.

8.     This marketplace model was preferred by owners because charging any amount beyond the cost of renting the property itself, such as a "traveler fee", significantly deters travelers from renting owners' vacation properties.  It also causes (and has caused) owners to reduce their rental prices to offset the additional charges.  In short, forcing travelers to pay additional rental fees unrelated to renting the vacation property itself caused owners to lose bookings and money.  Of equal importance is the fact that these fees depressed the value of the service that owners purchased from Defendant (_i.e._, the value of the property listing subscriptions).

9.     Defendant repeatedly represented to rental listing subscribers that it would continue to remain free to travelers, distinguishing itself from other online vacation rental listing websites, and was contractually obligated to do so.

10.     Defendant represented that it would continue to earn its revenue through the annual subscription fees paid by owners, and by offering optional services and tools to owners, rather than by resorting to traveler fees – which Defendant touted as a feature that distinguished it from its competitors.

11.     In reliance on Defendant's marketplace model, including Defendant's promise and reassurance that it would not charge additional fees to travelers, Plaintiffs and thousands of other owners entered into year-long contracts with Defendant for the right to list their rental vacation

properties on Defendant's websites. In exchange for that right, Plaintiffs and other property owners paid Defendant annual subscription fees, often thousands of dollars per property listing.

12.     Defendant knew that Plaintiffs and other owners relied on Defendant's marketplace model, including its promise not to charge travelers fees. Defendant was aware of Plaintiffs' and other owners' reliance on Defendant's representations when they entered into year-long contracts with Defendant and paid annual subscription fees to Defendant.

13.     Contracts that Plaintiffs and other owners entered into with Defendant specified that charges and fees in effect at the time of the subscription agreements would govern throughout the one-year term of those agreements. Accordingly, because Plaintiffs' and other owners' agreements, entered into prior to February 9, 2016, did not include a fee to travelers, Defendant was contractually prohibited from changing that term of the parties' agreements during the one-year contract term.

14.     Despite the contractual provision specifying charges and despite Defendant's repeated representations that use of its websites would remain free to travelers, on February 9, 2016 Defendant unilaterally abandoned and materially changed the contract, jettisoning its marketplace model and adopting an entirely different model and rate structure in the middle of the contractual period.

15.     From that point forward, Defendant adopted a materially different "online travel agency" model ("OTA model"), whereby Defendant began to charge additional fees to travelers for the use of its websites, giving these additional fees the generic label, "service fees."

16.     The "service fees" instituted as part of Defendant's OTA model were significant. They ranged from 4-10% of the total rental rate of owners' properties, thereby increasing the total cost to travelers.  Not only has Defendant breached its contracts with Plaintiffs and owners, but the

"service fees" have caused subscribers significant damage by reducing the number and value of bookings by travelers.

17.     By this action, Plaintiffs seek compensation for the damages that they and other similarly situated owners have suffered as a result of Defendant's breaches of contract, fraud and violation of consumer protection statutes, as well as other relief set forth herein.

## PARTIES

### Plaintiff Theodore Kirkpatrick

18.     Plaintiff Theodore Kirkpatrick ("Kirkpatrick") is an adult individual residing in Gwinn, Michigan. Kirkpatrick has been a HomeAway subscriber through HomeAway's VRBO.com website since May 2011.  On May 19, 2015, Kirkpatrick paid $349 to renew his one-year "classic" level subscription for his rental property located in Gwinn, Michigan.  Defendant never told Kirkpatrick about the traveler service fees prior to renewing his subscription in May 2015.  When Kirkpatrick decided to purchase his rental listing subscription, he saw and relied upon Defendant's online advertisements and statements—including representations regarding "no fees" and that there would "never" be traveler fees, displayed on Defendant's website—that it would not assess fees to travelers. Furthermore, nothing in his contract allows these fees to be assessed.  The traveler service fees assessed to Kirkpatrick's prospective travelers' rental quotes and bookings were consistently 9% of the total booking price, or approximately $93-95 per booking. Kirkpatrick complained to Defendant about this fee because it was causing him to lose travelers and rental income; however, Defendant did nothing to remedy the issue or make Kirkpatrick whole. Subsequently, Kirkpatrick did not renew his subscription with VRBO after it expired in May 2016 specifically because the service fee resulted in a significant decrease in bookings and inquiries. Kirkpatrick's subscription contract with HomeAway consists of (and his relationship with HomeAway and VRBO is governed by) the HomeAway Terms and Conditions

effective December 17, 2014. A true and correct copy of the Terms & Conditions effective December 17, 2014 is attached hereto as **Exhibit "A"**. Kirkpatrick has been injured as a result of Defendant's conduct as described herein.

### Plaintiff Christopher Coll

19.     Plaintiff Christopher Coll ("Coll") is an adult individual residing in West Grove, Pennsylvania. Coll has been a HomeAway subscriber through HomeAway's VRBO.com website since August 20, 2014.  On August 15, 2015, Coll's one-year "silver" level subscription for his rental property located in Avon, North Carolina renewed for $649. He allowed his subscription to renew based upon representations and marketing he observed on HomeAway's website at about the time he initially purchased his subscription which stated that travelers would never be assessed fees.  He then purchased a second one-year "silver" level subscription for $649 on January 11, 2016 for another rental property located in Salvo, NC.  Defendant never told Coll about the traveler service fee prior to Coll renewing and/or purchasing his subscriptions, and Coll did not know that Defendant would charge travelers service fees. Coll saw and relied upon advertisements and statements from Defendant that it would not assess these fees to travelers. Furthermore, nothing in his contract allows these fees to be assessed. Yet, Defendant unlawfully imposed traveler service fees of approximately 6-10% of the booking price.  As a result, Coll experienced such a significant reduction in the number of bookings and rental income that he was forced to sell both properties.  Coll's contracts with HomeAway consists of (and his relationships with HomeAway and VRBO are governed by) the VRBO Terms and Conditions effective August 11, 2015 (for the August 15, 2015 renewal) and September 15, 2015 (for the January 11, 2016 purchase). A true and correct copy of the Terms & Conditions effective August 11, 2015 is attached hereto as **Exhibit "B"** and the true and correct copy of the Terms & Conditions effective

September 15, 2015 is attached hereto as **Exhibit "C".**   Coll has been injured as a result of Defendant's conduct as described herein.

### Plaintiff Christopher O'Keefe

20.     Plaintiff Christopher O'Keefe ("O'Keefe") is an adult individual residing in Shelburne, Vermont.   O'Keefe initially signed up with VRBO on January 11, 2013, and subscribed to the "bronze" package.   In 2014, O'Keefe added the "global bundle" to his subscription, and in 2015 he added the "preferred" placement.   O'Keefe most recently renewed his subscription, on January 11, 2016. Plaintiff O'Keefe decided to initially purchase and later renew his subscription based upon Defendant's promises (which he observed at the point of initially purchasing the subscription) that it would never charge traveler fees. Plaintiff currently pays approximately $890 for his subscription with VRBO. O'Keefe's rental property listed with Defendant is located in Cape Coral, Florida. At the time of his renewal, Plaintiff was unaware that Defendant had abandoned its no-traveler-fee policy. Defendant never told O'Keefe about the traveler service fees prior to O'Keefe renewing his subscription in January 2016, and O'Keefe did not know that Defendant would charge traveler service fees. Indeed, O'Keefe saw and relied upon advertisements and statements from Defendant that it would not assess these fees to travelers, so he had no reason to ever make further inquiry into the issue. Furthermore, nothing in his contract allows these fees to be assessed. Due to the unlawful service fee to travelers, O'Keefe has experienced a significant reduction in the number of bookings for his rental property. O'Keefe's downturn in bookings and rental income is attributed to Defendant's unlawful traveler service fees of approximately 6% of the booking price, or approximately $176 per booking. O'Keefe's contract with HomeAway consists of (and his relationship with HomeAway and VRBO is governed by) the VRBO Terms and Conditions effective September 15, 2015. *See* Exhibit C. O'Keefe has been injured as a result of Defendant's conduct as described herein.

**Plaintiffs Michael and Debby Poprawa**

21.     Plaintiffs Michael and Debby Poprawa ("the Poprawas") are adult individuals residing in Eureka, California.  Plaintiffs initially signed up with VRBO on November 3, 2015 to list their rental property located in Limon, Costa Rica. The Poprawas paid $349 for an annual "classic" subscription and paid an additional $149 on November 9, 2015 for a six month banner display on the website.  Defendant never told the Poprawas that it would charge travelers a service fee prior to the Poprawa's purchase of the subscription, and the Poprawas were not otherwise aware that Defendant would charge service fees to their prospective travelers.  The Poprawas decided to purchase a subscription with VRBO because of the fact that they did not charge travelers service fees.  The absence of these fees is why the Poprawas decided to use VRBO. The Poprawas saw and relied upon advertisements and statements from Defendant that it would not assess these fees to travelers. Furthermore, nothing in the Poprawa's contract with Defendant allows these fees to be assessed. Defendant unlawfully assesses traveler service fees of 8-9% of the booking price.  Due to the unlawful and undisclosed traveler service fee charged by Defendant to the Poprawa's prospective travelers, the Poprawas have experienced a significant reduction in the number of bookings for their rental properties and have lost significant rental income.  The Poprawa's subscription contract with HomeAway consists of (and their relationship with HomeAway and VRBO is governed by) the HomeAway Terms and Conditions effective September 15, 2015. *See* Exhibit C. The Poprawas have been injured as a result of Defendant's conduct as described herein.

**Defendant HomeAway.com, Inc.**

22.     Defendant HomeAway.com, Inc., is incorporated in Delaware with its headquarters and principal place of business in Austin, Texas. HomeAway owns and operates at

least 40 websites, including, in the United States, HomeAway.com, VRBO.com, and Vacation Rentals.com.

23.     The true names, roles and/or capacities of Defendants named as DOES 1 through 10, inclusive, are currently unknown to Plaintiffs and therefore, are named as Defendants under fictitious names. Plaintiffs will identify Does 1 through 10 and their respective involvement in the wrongdoing at issue if and when their identities become known.

24.     The acts alleged to have been done by Defendants, and each of them were authorized, ordered or done by their directors, officers, agents, partners, employees or representatives while actively engaged in the management and affairs of each of Defendant's respective websites.

## JURISDICTION AND VENUE

25.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(d) of The Class Action Fairness Act because the matter in controversy exceeds the sum or value of $5,000,000 exclusive of interests and costs and because Plaintiffs and Defendant are residents of different states.

26.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because Plaintiffs suffered injuries as a result of Defendant's acts in this District, Defendant is authorized to conduct business in this District, Defendant resides in this District and Defendant is subject to personal jurisdiction in this District, and Defendant has consented to venue in this District.

## FACTS

**A.      Overview of VRBO and HomeAway**

27.     The vacation rental properties at issue are privately owned residential properties, including, but not limited to, homes, condominiums, villas, and cabins, that property owners

and/or property managers rent to the public on a short-term basis, either nightly, weekly, or monthly.

28.     Defendant, which was acquired by Expedia, Inc. in December 2015, is the world's largest and leading online marketplace for vacation rental properties.  As of 2016, Defendant's websites included approximately 1.2 million paid vacation rental listings in 190 countries.[1]

29.     Defendant primarily serves homeowners and managers of vacation properties who wish to rent vacation properties to tenants on a short-term basis, as well as travelers seeking to rent vacation homes on a short-term basis.

30.     Owners pay Defendant an annual subscription fee in exchange to list their vacation rental properties on one or more of Defendant's websites. Owners listing their properties may include additional information about the vacation property, including description, cost, availability, and photographs of the property.

31.     Until July 11, 2016, Defendant offered five varying VRBO.com subscription "levels" including classic, bronze, silver, gold and platinum. Classic was the least expensive subscription level, while platinum was the most expensive subscription level.  The price for a one-year subscription ranged in price from several hundred dollars to well over one-thousand dollars depending on the level.  And, "[b]y default, all subscriptions paid for by credit card [] automatically renew just prior to the renewal date."[2]

32.     Defendant advertises that owners obtain greater benefits at higher subscription levels.  The most significant benefit that owners receive for purchasing a more expensive subscription is a higher ranking in search results when travelers search Defendant's websites for

---

[1]  *See*  https://www.homeaway.com/info/media-center/press-releases/2016/homeaway-wins-2016-gold-magellan-award (last visited October 20, 2016).
[2]  *See* https://help.vrbo.com/articles/How-do-I-pay-for-or-renew-my-subscription-vrbo (last visited October 20, 2016).

rental properties. For example, rental properties posted by owners who are silver-level subscribers will appear before postings by classic-level subscribers.

33.     When travelers search one of Defendant's websites for a vacation rental property, they may select certain criteria such as location of the property, size of the property, travel dates and availability, as well as the number of guests. Based upon the traveler's search criteria, Defendant's website produces a list of vacation rental properties that populates the results based upon the subscription level – with the most expensive subscription levels appearing before less expensive subscription levels.

34.     Defendant also offers owners two different bundle options for an additional cost. United States subscribers may select either a "US Bundle" or a "Global Bundle." Owners can purchase the "US Bundle" allowing their rental properties to appear on Defendant's three principal U.S. websites: HomeAway.com, VRBO.com, and VacationRentals.com. Owners can purchase the more expensive, "Global Bundle" which allows their rental properties to appear on all three principal U.S. websites, as well as 24 international websites that are owned by Defendants. These bundle options are sold on a one-year subscription basis, and cost several hundred dollars each.

**B.      Defendant Represented it Would "Never" Charge Fees to Travelers**

35.     Prior to February 9, 2016, Defendant obtained revenue principally through the sale of varying subscriptions and bundles to owners who utilized its websites. Defendant did not charge travelers any additional service fees for booking rentals using its websites.

36.     In fact, Defendant consistently represented that browsing and booking through its websites was free to travelers (*i.e.* no service fees would be assessed), and would remain free to travelers pursuant to its marketplace model.  This model distinguished Defendant from other online travel competitors, such as TripAdvisor and Airbnb.

37.     An example of Defendant's representations that travelers would not pay a fee is

depicted below:



*See* https://web.archive.org/web/20150905072428/http:/www.vrbo.com/info/list-your-property?icid=IL_LYP_O_Text_lyptopnav (as of September 5, 2015).

38.     Defendant's websites, in fact, stated in numerous locations that that there would be

no booking fees for travelers:



*See* https://web.archive.org/web/20151029215610/http://www.vrbo.com/ (as of October 29, 2015).



*See* https://web.archive.org/web/20151027013527/http://www.homeaway.com/info/about-the-family (as of October 27, 2015).

39.     Defendant described this marketplace model, whereby travelers would ***never*** be charged for use of Defendant's websites, as an essential part of Defendant's business plan. Brian Sharples (hereinafter "Sharples"), HomeAway's co-founder and former CEO, described the performance-based marketplace model as central to HomeAway's business plan, giving HomeAway a competitive advantage over other performance-based companies in the industry.

40.     Defendant represented and promoted the fact that its websites were free to travelers, and would remain as such.  In HomeAway's November 2014 earnings call, Sharples reiterated this important differentiator by stating:

> **We are going to be free to travelers**. Trip advisor and Airbnb have chosen to charge big fees to travelers. Well, we're going to have a pretty sizeable marketing budget in the next few years. And **we're going to be letting everybody know, when you come to our platform and you don't pay a fee and we think that's a big deal**,

> because if you look historically at the travel industry, those
> competitors who adopted no traveler fees first are the ones that ended
> up being the big winners in that business."

41.     Additionally, at the 2011 Capital Factory Demo Day, Sharples discussed how Expedia ruined Vacationspot.com within a year of acquiring the leading vacation rental marketplace business by imposing such fees.   In early 2000, Expedia extinguished the Vactionspot.com subscription model and implemented a percentage based commission-model that assessed fees based on a percentage of the total booking price.[3]   Within a year, Vacationspot.com went out of business.

42.     Consistent with Defendant's representations, it remained for many years a marketplace model, charging fees to owners for listing their vacation rental properties on its websites, and permitting travelers to pay only the cost of the rental property itself, with no additional charges or fees.

43.     Paragraph 1 of Defendant's contract with subscribing owners, such as Plaintiffs, reflected the marketplace model in its Terms and Conditions, stating:

> HomeAway.com and other Sites act as a venue to allow homeowners
> and property managers who advertise on the Site (each, a "member")
> to offer for rent in a variety of pricing formats, a specific vacation or
> short term rental property to potential renters (each, a "traveler" and,
> collectively with a member, the "users").[4]

44.     Similarly, Defendant's website promoted the marketplace model, advertising as follows:

a.     "VRBO has no booking fees and is free for travelers."

b.     "No traveler fees. Free to book with no hidden costs."

c.     "No fees for travelers. No online booking fees or hidden costs."

---

[3] *See* https://www.youtube.com/watch?v=U6gbCDL02R0 (last visited August 28, 2017).
[4] *See* https://web.archive.org/web/20150310001635/http://www.vrbo.com/info/termsandconditions, at ¶ 1 (last visited August 28, 2017).

45.     Plaintiffs each own rental properties which they listed through Defendant. Plaintiffs purchased or renewed their subscriptions prior to February 9, 2016, and Defendant's unilateral imposition of a service fee to travelers occurred in the middle of a subscription period.

46.     In reliance on Defendant's representations that it was and would continue to remain a marketplace model, free to travelers, Plaintiffs purchased or renewed their subscriptions with Defendant prior to February 9, 2016.

## C.     The Expedia Acquisition and Defendant's Abandonment of Its Promises to Never Charge Traveler Fees

47.     By late 2014, Defendant began positioning itself for acquisition by establishing new business and advertising objectives while continuing to reiterate its promises to remain free to travelers. One such aggressive initiative, intended to satisfy the requirements of potential acquirers, was to move all bookings online by 2016.[5] To achieve this objective, Defendant rolled out its online booking mechanism ("OLB")—a system which was put in place on Defendant's websites to enable payment for rental bookings to be made directly through VRBO and Defendant's other websites.

48.     To induce subscribers to adopt this "voluntary," free, non-exclusive online booking feature that could be offered in conjunction to processing bookings and payments offline, Defendant rewarded owners who enabled OLB by increasing their listing search placement. Meanwhile, owners who did not elect online booking were punished by having their listing search placement drop.

---

[5] *See* https://skift.com/2014/12/11/homeaway-has-new-plan-to-force-vacation-rental-owners-to-accept-online-bookings/ (last visited August 28, 2017); *see also* https://www.vrbo.com/info/online-booking/vision (last visited August 28, 2017).

49.     Then, in early 2015, Defendant announced that it was increasing its $60 million marketing spend by 50% for a global, brand retrenchment advertising campaign, including digital media and television ads, that continued to consistently promote its "no booking fees" message.[6]

50.     An example of HomeAway's 2014 and 2015 advertisement campaigns are below:[7]



51.     Plaintiffs and Class members relied upon these advertisements and Defendant's unequivocal representations that travelers would not incur booking fees when Plaintiffs and Class members purchased and renewed HomeAway property listing subscriptions. This information was material to property owners, like Plaintiffs and Class members, because traveler fees were known to suppress bookings and rental income.

52.     On November 4, 2015, Defendant's objective was realized – Expedia agreed to acquire HomeAway for $3.9 billion. In a transcript of a conference call by Expedia, Inc. and HomeAway, Inc. to discuss the acquisition transaction on November 4, 2015, which was filed with the Securities and Exchange Commission ("SEC"), Defendant simultaneously announced the deal with Expedia and its unilateral introduction of a "traveler service fee".[8]   The traveler service fee was applied to all active, online booking enabled, annual subscriptions. As such, Plaintiffs and

---

[6]     *See*     http://www.adweek.com/news/advertising-branding/homeaway-invests-tens-millions-dollars-global-campaign-163086     (last     visited     August     28,     2017);     *see also* http://fortune.com/2015/02/20/homeaway-airbnb-priceline/ (last visited August 28, 2017).

[7]  *See* https://moat.com/creative/ba7fcf9288dd020b8b8721037d22900b?region=US (last visited August 28, 2017); *see also* https://moat.com/creative/8122499dfb73cc20edc8b232aff4575f? region=US (last visited August 28, 2017).

[8]  A copy of the November 4, 2015 SEC filing is attached hereto at **Exhibit "D".**

Class members who purchased their annual subscriptions prior to the introduction of the traveler service fee on February 9, 2016 had the rug pulled out from under them, as this conduct had the immediate effect of significantly reducing the volume of bookings.

53.     The introduction of the new traveler fee was a complete reversal and abandonment of all of Defendant's prior promises.

54.     Defendant continued to make representations that it would never charge traveler fees on its website just days before the announcement of the traveler fee, made in conjunction with the Expedia acquisition.

55.     Indeed, the VRBO website prominently displayed the message "VRBO has no booking fees and is free for travelers" and made other references to "no booking fees" elsewhere on the site as late as October 29, 2015—only six days prior to its November 4, 2015 public announcement of the Expedia acquisition and implementation of a traveler fee.

56.     At this point, rental property owners like Plaintiff Kirkpatrick were already locked into their annual rental subscription with Defendant. Other members, like the Poprawa Plaintiffs, were duped into purchasing their subscription in the days before this material change.

57.     This abrupt deviation from the "no/never fees" policy did not just materialize overnight – it was part of a longer negotiation with Defendant's potential acquirer, Expedia, that was meant to sweeten the potential deal by creating a large, additional income stream.

58.     Defendant's conduct and the timeline leading up to the introduction of the traveler fees—and in light of the short period of time that elapsed between making these promises and rolling out the traveler fee—is indicative that Defendant did not intend to make good on its promises of "no/never fees."

59.     Defendant's affirmative representations that it charges no traveler fees and that it never will just days before announcing the fee makes clear that Defendant's promises of

"no/never fees" were false and that Defendant knew they were false promises, or that Defendant made these promises without being certain that it could uphold them.

60. Making matters worse, Defendant did not reasonably notify its members of this change to its business model, and when Plaintiffs and Class members became apprised of this change when it took effect in February 2016, it was usually by surprise – *e.g.* would-be-vacationers informing rental property owners that they have decided not to book because of the traveler fee, or members observing a large reduction of their rental income on a booking due to the traveler fee charge.

61. At the time Plaintiffs purchased or renewed their subscriptions, Paragraph 21 of Defendant's Terms and Conditions specified that any non-clerical or substantive changes to the Terms and Conditions would be effective only if approved by Plaintiffs:

> We reserve the right, in our sole discretion, to amend these Terms, in whole or in part, at any time, with or without your consent and you acknowledge and agree that your consent to any such amendment is not required in the event that the proposed amendment is clerical and/or non-substantive in nature. Notification of any amendment will be posted on the Site by the indication of the last amendment date at the top of these Terms, and will be effective immediately. If you disagree with any non-clerical and/or substantive amendment to these Terms, then . . . your sole remedy as a member is to withhold your consent to the applicability of the proposed amendment to your use of the Site, in which case your use of the Site will continue to be governed by the terms and conditions that were applicable to your use of the Site during the then current term of your subscription as the same were in effect immediately prior to the proposed amendment you agree that you are responsible for keeping a copy of such terms.

62. Thus the terms of the contract between Plaintiffs and Defendant prohibited HomeAway from changing its fees or rates during the one-year term of the contract and the subscription for which Plaintiffs had paid, without Plaintiffs' prior consent.

63. At no time since renewing their subscriptions have Plaintiffs consented to any changes in Defendant's fees or rate, including specifically the service fee to travelers. In fact,

when members would call or otherwise contact Defendant to complain or reject the imposition of the traveler fee under the HomeAway Terms and Conditions, Defendant would disregard these complaints or rejections and proceeded to charge the fee to travelers, to the great detriment of members' rental income and rental businesses.  This is consistent with the experience of Plaintiff Kirkpatrick.

64.     Despite this, and despite Defendant's contractual obligations, Defendant unilaterally, substantively, non-clerically and materially altered its fee and rate structure on February 9, 2016. This change meant that Defendant's websites would no longer be free to travelers as previously promised, and Defendant would no longer use the marketplace model that it had promoted and advertised to Plaintiffs and other owners.  Defendant refused to allow property owners to withhold their consent to these changes.

65.     After February 9, 2016, Defendant began charging travelers "service fees" of between 4% and 10% of the total rental rate of owners' properties.  Defendant's "service fees" cost travelers hundreds of dollars, in addition to the owner's rental rate.  As a result, many prospective travelers have been deterred from renting through Defendant's websites, thus greatly impacting Plaintiffs and other rental owners' bookings and rental incomes.

66.     For Plaintiffs and other owners, the effects of Defendant's newly imposed "service fees" was significant, immediate, and negative, reducing the number and value of bookings when compared with previous years.

67.     Scores of virtually identical complaints about this exact conduct by Defendant can be found on the internet from consumers across the country. A small sample of the countless consumer complaints about Defendant's service fee are reproduced verbatim below [all *sic*]:

- **Carrie of Haleiwa, HI on May 10, 2016**
  I have been with VRBO for 5 years and each year they increase their subscription fees. I've renewed my contract each year because I've

found that consumers have become increasingly aware of the VRBO name and I like the web site (somewhat easy to work). I just became aware this week that VRBO is now charging the public (consumers, my guest) a very large fee to book through their website. I'm totally confused!

I paid VRBO a total of $3,370 last winter to list my two villas on their site. ***Now here we are mid year and they have suddenly changed policy?*** I had an inquiry yesterday on one of my villas and attached to my quote (WITHOUT MY PERMISSION) was an additional $350 dollars that would go to VRBO. I call this DOUBLE DIPPING!!! I did not agree to this and I would much rather pay a higher rate to use the website on my end than to charge my guest outrageous fees to VRBO. This seems criminal. I will now lose clients. I suspect VRBO will get more and more greedy while my business loses. Does the CEO of VRBO really think they can stay in business if we, the owners cannot? Our guest are already looking for a "deal" when booking through a private owner and not a hotel. How can we now compete? You are making our business unaffordable to the public.[9]

- **Sam of Nashville, TN on April 16, 2016**
  February 2016 VRBO has ***deceptively added a 4-10% service fee***, paid by the renter, for all reservations booked using the VRBO payment process. This homeowner, as well as most other homeowners, believes this fee is without merit as the homeowner already pays a hefty fee for advertising on VRBO and the fee does not add any value for the renter. VRBO's justifications for this fee are 24/7 customer service and secure payments. The 24/7 customer service is just a marketing ploy because if a renter has a problem with the rental they will call the homeowner for remedy. The secure payment is also a marketing ploy because for the last 4 years I have used VRBO's payment process without any security problems. Expedia purchased VRBO in late 2015 paying 4 billion dollars for VRBO's 1 million subscriptions and this fee is just a way to recoup that layout.

  This homeowner will not be renewing the subscription when it is due because I believe this is corporate greed at its highest level. The fee was introduced without the knowledge of the homeowner and the only way to fight a large corporation is by impacting their bottom line. Potential renters should be aware of this "service fee" and refuse to pay it. Call VRBO customer service to voice your dissatisfaction and help all renters and homeowners by booking your reservation thru PayPal or personal check. If we don't speak out corporate greed wins.

---

[9]   *See*  https://www.consumeraffairs.com/online/vrbo.html?page=2  (last visited  June  22,  2016) (emphasis added).

My suggestion for both homeowners and renters is to fight this unnecessary fee and use Vacation Home Rentals as your primary site to both advertise and reserve vacation rentals.[10]

- **Dorinda of Tiburon, CA on April 14, 2016**
  Since the new fees have been enforced, I have not had one new booking. Last year at this time I was almost booked for the season. So far, monthly renters who see a "service charge" of $499.00 payable to VRBO either haven't responded beyond seeing the fee or have responded by asking me to eat the fee on my end. Worst of all, despite the rhetoric, ***there is no real added value to support the new fees. It is all just a money grab***.[11]

- **Judy of New York, NY on April 3, 2016**
  Earlier this year, VRBO/Homeaway imposed a new service on people who rent my beach house. The fee, up to $499, has driven renters away from their websites. In the past, I'd be fully booked for summer by now. This year, I have not had one inquiry since January. I paid $699 to list my property. Their greed has made my listing worthless. What can be done?[12]

- **Charlotte of Wilsonville, OR on March 26, 2016**
  We have been with VRBO with a flat fee for over a year and have been very pleased until we are suddenly hit with this outrageous "service fee". What service? I do not consider a percentage of the total booking any sort of service fee. It is a brazen money grab where neither the owner nor the renter has any say in the matter. A service fee should be a flat fee to cover the actual booking service, say $15-20. But an extra $200 or more for a service fee? That's just extortion. I do not want or need their marketing assistance and if I did I would pay extra for it as many VRBO owners currently do. The transient room tax in my area is 12% so with this additional take from VRBO we are over 20% additional before cleaning, insurance, etc. We will definitely be looking at moving to another site.[13]

- **Bryan of Washington, DC on March 24, 2016**
  I am a property owner and have used VRBO for this property since 2008. We always sell out the entire summer... with the exception of this year. VRBO implemented substantial fees which will increase the money they get from my rentals by over 700% all at once. They say this is for a guarantee, which does not guarantee anything additional for the renter, and to increase their advertising budget. Increasing

---

[10] *Id.* at page 4 (emphasis added).
[11] *Id.* at page 5 (emphasis added).
[12] *Id.* at page 6.
[13] *Id.* at page 7.

advertising budget by 700% when you have a monopoly on the market does not sound fair at all. ***This was implemented without any coordination with the property owners, without any input from property owner and the largest impact to be realized is to the property owners. It's like if you rented a car for one month and in week 2, they added more service fees to the rental, changed the rental agreement in the background and threaten to come and take the car if you don't pay the new fees. A breach of agreement***.[14]

- **Darlene of Selma, AL on March 18, 2016**
  I too have been using VRBO for years with great success, and paying my yearly fee. As of now I have one rental, and that's only because they booked before the new (unannounced) fee appeared! This is not a flat rate fee, it is a 4 to 9% fee depending on the rate I charge my renters. THIS MEANS THE HIGHER END THE UNIT IS THE HIGHER THE PERCENTAGE. This is what I was told by a VRBO representative when I called to complain. The representative had a long drawn out explanation which boiled down to pure greed! One of the great advantages of using a VRBO was affordability over booking through a travel agent thus avoiding the "service fees". I personally HAVE BOOKED MY LAST TRIP THROUGH VRBO. It just seems to me that there has to be some legal issues behind this and I do plan to speak to my attorney today. I'll report on how it goes... VRBO you get 1 star. You are at the bottom of the scum bucket in my opinion!!![15]

- **Hugh of Albuquerque, NM on March 4, 2016**
  I can confirm via personal billing experience what others have said about the new VRBO fees. VRBO is suddenly increasing their revenue many-fold, exhibiting extraordinary greed. They are charging my renters 9% of the owner's income. They have also increased their credit card processing fee as well. Mine went from 2.5% to 2.9%. I gather that they will also increase their annual listing charge to about $400. Even excluding their annual charge, their take is 11.9%, which exceeds my, and probably most owners' net profit. Despite their new fees, which the CEO tried to justify as intended to improve customer service, they have created a new communications wall so that you can no longer e-mail them.

  The new fee structure is incomprehensible, and VRBO is making false claims. One VRBO website page claims the new renter fee will be 5%, another says it will slide from 4-9%, but gives no info about why, how it slides. My fee, not including the additional credit card fee, was 9%. ***There truly was no warning, despite VRBO's claims to***

---

[14] *Id.* (emphasis added).
[15] *See* https://www.consumeraffairs.com/online/vrbo.html?page=8 (last visited June 22, 2016).

*contrary. I noticed first fee this month, March 2016, and had no earlier notice from VRBO.* Can anyone recommend another company?[16]

- **Sandra of Charlotte, NC on February 29, 2016**
  I've utilized the VRBO site for my cabin for over two years and while quoting a vacation to a potential renter on the phone today noticed a "SERVICE FEE". It's 4 - 10% the total of my rental. Shame on you!!! This is triple dipping, VRBO. Seriously. Not how to conduct business. You were just purchased by Expedia -- who should understand the value of a BRAND. You've just significantly damaged YOURS by poaching from your clients -- that would be US, the people who own vacation properties without whom there would be no VRBO/Homeaway. *I held my end of the agreement and paid you contractually what I owed for one year as I understood. I DID NOT agree to an additional fee outside of the OTHER one that you also apply when my guests pay online.* I believe I'll be taking a vacation from VRBO. Pathetic business practices![17]

- **Diana of Panama City Beach, FL on February 28, 2016**
  We have just lost a $7000 booking because *VRBO has added a fraudulent "service fee" to my listing* which is $390. My renters just emailed me and told me VRBO has refused to take off the fee and this is the reason why they won't be booking my unit. *I have never agreed to the service fee*, since I signed up and paid a $1300 listing fee for no booking fees! BAD BUSINESS![18]

- **DRK459 from Boulder, CO on February 19, 2016**
  I have 3 properties listed with vrbo, Im disgusted with VRBO and how they added this service fee on top of many other fees. I'm asking my vacation renters to pay via paypal to avoid this service fee. I also listed all my properties on Trip advisor. I will not renew my listings with VRBO. GREED GREED GREED!!!!!![19]

- **TurbineSeaplane from Boise, ID on February 23, 2016**
  This is TOTALLY outrageous....

  We have 2 properties on VRBO and this completely brings into question the viability of using them moving forward.

  4-10% is not even close to a "small thing" - It's a complete deal

---

[16] *Id.* at page 11 (emphasis added).

[17] *Id.* at page 14 (emphasis added).

[18] *Id.* (emphasis added).

[19] *See* https://www.tripadvisor.com/ShowTopic-g60842-i150-k9271843-o20-VRBO_now_charging_a_booking_fee-Gatlinburg_Tennessee.html (last visited June 22, 2016).

breaker and for absolutely no value provided (we already pay them $1300/year + extra for CC processing)

TOTALLY nuts...Just nuts...[20]

- **Helen Szczuczko from Mesa, AZ on April 7, 2016**
  YES – VRBO DOES HAVE A NEW "SERVICE FEE" – TO BE PAID BY THE RENTER!!

  Let me add my voice to the chorus of property owners disgusted with VRBO and their institution of this new "service fee" – to be paid by renters. I had been wondering why rental inquiries for my properties had recently dwindled so drastically. Upon receiving an inquiry today I went to the dashboard and was horrified to see a 9% service fee added onto the price quote breakdown for my potential future renter. I called VRBO customer service voiced my extreme dissatisfaction, only to be greeted by an agent doing her very best to try and justify this additional charge. There is NO JUSTIFICATION for it. VRBO substantially increased their advertising charges less than 18 months ago. My platinum level charges increased by almost 30% per year. Now it appears VRBO is looking for further revenue and this time it its the renters who have to pay. All this does for property owners, is diminishes the number of inquires and ultimate rentals. I am going to look at moving my properties elsewhere and in the meantime – until my subscription runs out, inform anyone inquiring about renting over VRBO that this new "service fee" has nothing to do with me. It is just VRBO being greedy. I intend to give potential renters alternative options for rental – where they will not have to pay this fee. 2 years ago I would have given VRBO a 5 star rating – now unfortunately it would only be 1 star[21]

- **Tim from Charleston, SC on March 21, 2016**
  We have been listing our rental property with VRBO for over 12 years and until this year they were great. As other owners have noted below, they started charging our guests a 10% service fee on all bookings. Our inquiries and bookings have plummeted. VRBO never communicated the new fee to owners before it went into effect. We had just renewed our listing and paid the annual $500 fee and no mention of this. Essentially this is GREED plain and simple and we need to decrease our fees to not lose business or find somewhere else to list.[22]

---

[20] *Id.* at page 7.
[21] *See* https://bestcompany.com/vacation-rentals/company/vrbo/ (last visited June 22, 2016).
[22] *Id.*

**D.      Defendant's Evolving Policy Changes to Enforce the Imposition of the Traveler Fee**

68.      When Defendant originally rolled-out the OLB initiative, it was presented as a non-exclusive add-on that essentially gave owners the flexibility to offer both online and offline bookings.  While online bookings are processed through Defendant's reservation system, offline bookings permit owners to accept payments outside Defendant's websites through, *inter alia*, checks, bank transfers, PayPal, and credit card payments taken over the phone. In exchange for electing to enable OLB, Defendant rewarded owners by giving their listings preferential listing placements in search results.

69.      However, after the Expedia acquisition on December 15, 2015 and implementation of the traveler fee on February 9, 2016, Defendant recognized that under the current Terms and Conditions owners with OLB enabled, who were receiving the benefit of increased search placement, were able to avoid the imposition of the traveler fee by accepting payments offline. Defendant, discretely and without any notice or approval, extinguished this workaround by unilaterally and materially revising the Terms and Conditions (dated July 1, 2016) by inserting in Provision 9 the requirement that subscribers with OLB enabled "agree not to encourage or advise a traveler to avoid or circumvent the service fee charged by HomeAway." *See* https://web.archive.org/web/20160725210252/https://www.homeaway.com/info/about-us/legal/terms-conditions (as of July 25, 2016); *see also* https://web.archive.org/web/20160717002816/https://www.vrbo.com/info/termsandconditions (as of July 17, 2016); *contra* https://web.archive.org/web/20160617220937/https://www.homeaway.com/info/about-us/legal/terms-conditions (as of June 17, 2016) and https://web.archive.org/web/20160622152227/https://www.vrbo.com/info/termsandconditions (as of June 22, 2016).

70.      In an effort to enforce this new, undisclosed policy, Defendant began actively monitoring OLB enabled property listings to ensure that the listings did not contain any language

directing or offering travelers to book offline.  Furthermore, Defendant even began supervising communications exchanged between owners and travelers through its website to ensure compliance with its evolving Terms and Conditions.  Identification of language about booking offline or even messaging scrutinizing the assessment of Defendant's traveler fee would result in immediate, permanent or temporary, deactivation of the property listing, absent any warning or advanced notice. Examples of these repercussions are set forth in more detail in the Declarations submitted herewith. *See* **Exhibit "E"**.[23]

71.     Therefore, as a result of Defendant's policy change restricting OLB enabled listings from booking offline, owners were placed quintessential Catch-22.  On one hand, if an owner elects to activate OLB in exchange for a favorable search ranking, bookings are exclusively processed through the online reservation system and the mandatory traveler fee is automatically assessed, thereby reducing inquiries, bookings, and rental income.  On the other hand, if an owner does not elect to activate OLB in order to process payments outside Defendants' reservation system to avoid the traveler fee, Defendant penalizes them by burying their listing in the search results, thereby reducing inquiries, bookings and rental income.

72.     In either scenario, Defendant materially altered the terms and diminished the value of its members' subscriptions.  As a result of Defendant's drastic, yet remarkably quiet, change in its treatment of offline booking and imposition of a traveler fee, owners suffered significant harm stemming from reduced rental inquiries, bookings, and rental income.

---

[23] For example, one Class member's property listing was deactivated without any advance notice because Defendant determined that the listing was not in compliance because it contained messaging informing potential travelers that HomeAway was solely responsible for the traveler fee and that the property owner did not agree with the fee. *See* Ex. E, Laslo Declaration at ¶¶ 6-8. Another Class member confirms that Defendant deactivated her property listing because Defendant located a private exchange between the owner and a potential traveler about possibly booking offline. *See* Ex. E, Bucy Declaration at ¶¶ 6-8.  Whereas, another Class member's property listing was deactivated for nearly a month as a penalty for including language offering prospective travelers the ability to book offline to avoid the fee. *See* Ex. E, Adamson Declaration at ¶¶ 5-7.

73.     Meanwhile, Expedia touted the value and revenue derived from the traveler fee in its SEC filings by stating the following:

- "In addition, in February 2016, HomeAway launched a traveler service fee in the United States, consistent with the market practice. The fee is expected to contribute to HomeAway's revenue growth and help fund marketing investment, programs to better protect travelers and future growth initiatives." *See* Expedia, 10-Q, for the quarterly period ended March 31, 2017.

- "HomeAway revenue increased for the three months ended March 31, 2017, compared to the same period in 2016, primarily due to growth in transactional revenue of 171% driven by a benefit from the traveler service fee, partially offset by lower subscription revenue of 25%." *See id.*

|  | Three months ended March 31, | | |
|---|---|---|---|
|  | 2017 | 2016 | % Change |
|  | ($ in millions) | | |
| *Revenue by Business Model* | | | |
| HomeAway | 185 | 142 | 30% |

*See id.*

- "HomeAway revenue increased for the three and six months ended June 30, 2017, compared to the same periods in 2016, primarily due to growth in transactional revenue of approximately 130% and 145% driven by a benefit from the traveler service fee, partially offset by subscription revenue decreasing approximately 35% and 30%." *See* Expedia, 10-Q, for the quarterly period ended June 30, 2017.

|  | Three Months Ended June 30, | | | Six months ended June 30, | | |
|---|---|---|---|---|---|---|
|  | 2017 | 2016 | % Change | 2017 | 2016 | % Change |
|  | ($ in millions) | | | ($ in millions) | | |
| *Revenue by Business Model* | | | | | | |
| HomeAway | 224 | 172 | 31% | 409 | 314 | 30% |

*See id.*

74.     As a result of the foregoing conduct by Defendant, Plaintiffs and other Class members have been damaged by Defendant's "service fees" in at least the following ways:

(a)     Plaintiffs and Class members' subscriptions to Defendant's websites are devalued. Plaintiffs and other owners agreed to Terms and Conditions which did not impose fees to travelers, and paid for Defendant's website subscriptions in reliance on those Terms and Conditions, which did not impose additional fees upon travelers. Defendant specifically represented, advertised, and promised that it would not charge fees to travelers. Had Defendant been honest and revealed the fees to travelers when Plaintiffs and other owners subscribed,

Plaintiffs and other owners would not have subscribed to, or would have paid less for their subscriptions.

(b)     Plaintiffs and other owners have lost bookings because of Defendant's newly imposed "service fees" to travelers. Travelers decline to rent Plaintiffs' and other owners' vacation rental properties when they are confronted with the obligation to pay additional fees beyond the cost of the rental property itself. As a result, Plaintiffs and other owners are now receiving fewer bookings than they would have received absent Defendant's newly imposed "service fees."

(c)     Plaintiffs and other owners did not agree or consent to a unilateral, material alteration of those contracts by Defendant, and have been damaged by Defendant's breach(es) of contract.

## CLASS ALLEGATIONS

75.     Plaintiffs incorporate each of the preceding allegations by reference as though fully set forth at length.

76.     Plaintiffs seek certification of the following Nationwide Class pursuant to FED. R. CIV. P. 23:

> All persons in the United States who paid for a subscription to list property for rent on one or more of HomeAway's websites before February 9, 2016, who did not purchase or renew a subscription on or after that date, and whose bookings are or have been subjected to a traveler fee.

77.     In the alternative, Plaintiffs seek certification of the following state subclasses:

**California Class**

> All persons residing in California who paid for a subscription to list property for rent on one or more of HomeAway's websites before February 9, 2016, who did not purchase or renew a subscription on or after that date, and whose bookings are or have been subjected to a traveler fee.

**Michigan Class**

All persons residing in Michigan who paid for a subscription to list property for rent on one or more of HomeAway's websites before February 9, 2016, who did not purchase or renew a subscription on or after that date, and whose bookings are or have been subjected to a traveler fee.

**Pennsylvania Class**

All persons residing in Pennsylvania who paid for a subscription to list property for rent on one or more of HomeAway's websites before February 9, 2016, who did not purchase or renew a subscription on or after that date, and whose bookings are or have been subjected to a traveler fee.

**Vermont Class**

All persons residing in Vermont who paid for a subscription to list property for rent on one or more of HomeAway's websites before February 9, 2016, who did not purchase or renew a subscription on or after that date, and whose bookings are or have been subjected to a traveler fee.

78.     The claims of all Classes are subject to Texas law, pursuant to the Choice of Law Provision in Defendant's Terms and Conditions.

79.     The above classes may be referred to collectively as the "Class." Plaintiffs reserve the right to modify or amend these definitions if discovery and further investigation reveals that the classes should be expanded, divided into additional subclasses, or modified in any other way.

80.     Excluded from the Class are: Defendant and any entities in which Defendant has controlling interest; any entities in which Defendant's officers, directors, or employees are employed and any of the legal representatives, heirs, successors, or assigns of Defendant; the Judge to whom this case is assigned and any member of the Judge's immediate family and any other judicial officer assigned to this case; all persons or entities that properly execute and timely file a request for exclusion from the Class; and any attorneys representing the Plaintiffs or the Class.

81.     The potential Class and sub-classes are so large that joinder of all members would be impracticable. Additionally, there are questions of law or fact common to the class, the claims or defenses of the representative parties are typical of the claims or defenses of the class, and the representative parties will fairly and adequately protect the interests of the class.

82.     This action satisfies all requirements of Fed. R. Civ. P. 23, including numerosity, commonality, typicality, adequacy, predominance and superiority.

83.     **Numerosity:** the Class is so numerous that joinder of all members is impracticable. While the exact number is unknown at this time, it is generally ascertainable by appropriate discovery.

84.     **Commonality:** the claims made by Plaintiffs meet the commonality requirement because they present shared questions of law and fact, and resolving these questions will resolve the class-wide litigation. These shared questions predominate over individual questions, and they include without limitation:

> a.     Whether the Terms and Conditions restrict HomeAway from unilaterally changing its fees and rates without approval;
>
> b.     Whether HomeAway misrepresented that it would not charge fees to travelers;
>
> c.     Whether the conduct alleged herein is in violation of the Texas Deceptive Trade Practices Act;
>
> d.     Whether HomeAway's practice of charging fees to travelers breached the parties' contracts;
>
> e.     Whether HomeAway's practice of charging fees to travelers deprived Class members of the benefits of their contracts;
>
> f.     Whether HomeAway's conduct injured the Class and sub-classes;

> g.   The amount of revenues and profits HomeAway received and/or the amount
> of monies or other obligations imposed on or lost by the Class members as a
> result of HomeAway's conduct;
>
> h.   Whether Class members are threatened with irreparable harm and/or are
> entitled to injunctive and other equitable relief and, if so, what is the nature
> of such relief; and
>
> i.   Whether the Class members are entitled to payment of equitable monetary
> relief and/or damages plus interest thereon, and if so, what is the nature of
> such relief.

85.   **Typicality:** Plaintiffs' claims are typical of those of the other class members because Plaintiffs, like every other class member, have been damaged by Defendant's conduct because Plaintiffs and all members of the Class entered into substantially identical contracts with Defendant pursuant to which they were permitted to list their vacation rental properties on one or more of Defendant's websites. Pursuant to the terms of those contracts, Defendant was prohibited from changing its rates and charges during the terms of those agreements without the express approval of Plaintiffs and the Class members. Notwithstanding the fact that Plaintiff and Class members did not approve any changes to Defendant's rates or fees, Defendant unilaterally and unlawfully changed its rates and fee model during the term of its contracts with Plaintiffs and Class members. Plaintiffs and Class members have been damaged by Defendant's conduct in that their subscriptions to Defendant's websites have been devalued to an amount less than what they paid for those subscriptions and in that they have lost bookings of their vacation rentals that they otherwise would have received in the absence of Defendant's fee to travelers.

86.   **Adequacy:** Plaintiffs will fairly and adequately represent and protect the interests of the class because Plaintiffs have no conflicts of interest that would be antagonistic to those of

the other Class members. Plaintiffs seek no relief that is antagonistic or adverse to the members of the Class, and the damages Plaintiffs have suffered are typical of other Class members.

87.    **Superiority and Predominance of Common Questions:** Class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class members, who could not individually afford to litigate their claims against a large corporate Defendant. Further, even for those Class members who could afford to litigate such a claim, it would remain an economically impractical alternative.  Moreover, as extensively set forth above, questions of law or fact common to class members predominate over any questions affecting only individual members.

88.    The nature of this action makes the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiffs and the Class members for the wrongs alleged because Defendant would necessarily gain an unconscionable advantage since it would be able to exploit and overwhelm the limited resources of each individual Class member with superior financial and legal resources; the costs of individual lawsuits could be cost prohibitive in light of the amounts that may be recovered; proof of a common course of conduct to which Plaintiffs were exposed concerning their properties is representative of that experienced by Class members and will establish the right of each member of the Class to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

89.     Plaintiffs will fairly and adequately protect the interests of the Class. The interests of the Class representatives are consistent with those of the other members of the Class. In addition, Plaintiffs are represented by experienced and able counsel who have extensive experience and expertise in the areas of consumer and contract law, trial practice, and class action representation.

90.     The class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Because of the number and nature of common questions of fact and law, multiple separate lawsuits would not serve the interest of judicial economy.

91.     Defendant has acted, and refuses to act, on grounds generally applicable to the Class, thereby making appropriate final equitable relief with respect to the Class as a whole.

## CAUSES OF ACTION

### COUNT I
### VIOLATIONS OF THE TEXAS DECEPTIVE TRADE PRACTICES ACT
TEX. BUS. & COM. CODE §§ 17.41, *et seq.*("DTPA")
(On Behalf of All Plaintiffs and the Nationwide Class, or
Alternatively, the State Sub-Classes)

92.     Plaintiffs repeat, reallege and incorporate by reference each of the foregoing allegations as though fully set forth herein.

93.     Defendant's conduct as alleged herein constitutes false, misleading, or deceptive trade acts or practices in violation of the DTPA.

94.     Plaintiffs and Defendant are each "persons" as defined by TEX. BUS. & COM. CODE § 17.45(3).

95.     The Defendant's rental property listing subscriptions are goods and/or services under TEX. BUS. & COM. CODE § 17.45(1).

96.     Plaintiffs and members of the Class are "consumers" as defined in TEX. BUS. & COM. CODE § 17.45(4).  Defendant has at all relevant times engaged in "trade" and "commerce" as

defined in TEX. BUS. & COM. CODE § 17.45(6), by advertising, offering for sale, and selling the subscriptions in Texas, directly or indirectly affecting Texas citizens through that trade and commerce.

97.     By failing to disclose that it would charge traveler fees, despite affirmative representations to Plaintiffs and the Class, Defendant engaged in deceptive business practices prohibited by the DTPA, including engaging in acts or practices which are unfair, misleading, false, or deceptive to the consumer.

98.     As alleged above, Defendant made numerous material statements about the benefits and characteristics of the subscriptions that were either false or misleading. Each of these statements contributed to the deceptive context of Defendant's unlawful advertising and representations as a whole.

99.     Defendant owed Plaintiffs and the other class members a duty to disclose that it intended to charge substantial traveler fees using Defendant's websites to book short-term rentals, because Defendant:

    a.    Made incomplete representations about the characteristics and performance of the subscriptions generally, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

    b.    Advertised goods and/or services with the intent not to sell them as advertised by representing that it would not charge travelers additional fees, when in fact, Defendant knew it would impose additional fees and label those fees, "service fees".

    c.    Represented that the agreement with Plaintiffs and other members of the Class would confer or involve rights, remedies and obligations when in

fact it did not, by falsely representing that subscriptions were based on the marketplace model in which travelers would not incur additional fees owed to Defendant.

100.     Prior to Plaintiffs' initial purchase or renewal of Defendant's subscriptions, Defendant consistently represented that booking through its websites was and would remain free to travelers and that it would "never" charge traveler fees, and/or did not conspicuously disclose to Plaintiffs and members of the Class that Defendant was adjusting its marketplace model.

101.     To their detriment, Plaintiffs and members of the Class relied upon Defendant's material representations that it would not charge additional fees to travelers, and/or relied on the absence of disclosure by Defendant that it would unilaterally change its marketplace model and rate structure to impose a substantial fee upon travelers for renting vacation rental properties through Defendant's websites, and Defendant made these material representations to induce Plaintiffs and members of the Class to act, *i.e.* to pay for a year-long subscription.

102.     Furthermore, Defendant made affirmative representations and promises that it would "never" charge traveler fees within days of announcing its acquisition by Expedia and the roll-out of a "traveler fee" that constituted a complete abandonment and reversal of its longstanding, previous promises that such a fee would never be assessed.

103.     The short duration of time between which Defendant made representations and promises that it would remain free to travelers and that it would "never" charge traveler fees, and the point in time that it announced the traveler fee, make clear that Defendant made promises with no intent to perform and with knowledge of their falsity. The circumstances surrounding the imposition of the traveler fee also creates a reasonable inference of fraud.

104.     Defendant's intentional concealment of and failure to disclose to Plaintiffs and Class members that it would charge traveler fees also constitutes an "unconscionable action or

course of action" under TEX. BUS. & COM. CODE § 17.45(5) because, to the detriment of Plaintiffs and the other Class members, that conduct took advantage of their lack of knowledge, ability, and experience to a grossly unfair degree.

105.     That "unconscionable action or course of action" was a producing cause of the economic damages sustained by Plaintiffs and the other Class members.

106.     As a result of Defendant's unlawful acts in violation of the DTPA detailed above, Plaintiffs and the Class sustained damages and are, therefore, entitled to damages and other relief as provided under the DTPA.  Defendant's acts and/or omissions in violation of the DTPA as detailed above, were each a producing cause of economic damages to Plaintiffs and the Class.

107.     Plaintiffs and the other Class members also seek recovery of treble damages as additional statutory damages under the DTPA pursuant to § 17.50(b)(1), as the acts and omissions of Defendant alleged above were committed intentionally and/or knowingly. Awarding treble damages in this case is necessary to encourage private enforcement of Texas's consumer protection laws. Pursuant to § 17.50(d), Plaintiffs and the Class also request recovery of costs and attorneys' fees, and any other relief the Court deems proper, as permitted by the DTPA.

**COUNT II**
**FRAUD/FRAUDULENT CONCEALMENT**
**(On Behalf of All Plaintiffs and the Nationwide Class, or**
**Alternatively, the State Sub-Classes)**

108.     Plaintiffs repeat, reallege, and incorporate by reference each of the foregoing allegations as though fully set forth herein.

109.     Prior to Plaintiffs' initial purchase or renewal of Defendant's subscriptions, Defendant consistently represented that booking through its websites was and would remain free to travelers and/or did not conspicuously disclose to Plaintiffs and members of the Class that Defendant was adjusting its marketplace model. Defendant knew Plaintiffs and Class members relied upon these material representations, and Defendant made these material representations to

induce Plaintiffs and members of the Class to act, *i.e.*, to pay for a subscription or renewed subscription.

110.    Those representations were material to Plaintiffs, such that, had Plaintiffs known that the representations were false, Plaintiffs would not have bought or renewed their subscriptions, or would have purchased the subscriptions at a lesser price. But Plaintiffs did not know the true facts, and relied upon the material representations made by Defendant.

111.    Defendant concealed and failed to disclose to Plaintiffs and Class members that, despite its affirmative representations that it would not charge traveler fees, it was going to do so.

112.    As a result of Defendant's fraudulent representations and omissions, Plaintiffs and members of the Class were induced into the purchase of goods and/or services that they otherwise would not have purchased, or would have paid less, and have suffered injury, harm and damages as described herein.

**COUNT III**
**UNJUST ENRICHMENT**
**(On Behalf of All Plaintiffs and the Nationwide Class, or**
**Alternatively, the Michigan, Pennsylvania, and Vermont Sub-Classes)**

113.    Plaintiffs repeat, reallege and incorporate by reference each of the foregoing allegations as though fully set forth herein.

114.    As the intended and expected result of its conscious wrongdoing, Defendant has profited and benefited from the purchase of rental property listing subscriptions by Plaintiffs and the Class.

115.    Defendant has voluntarily accepted and retained these profits and benefits, with full knowledge and awareness that, as a result of Defendant's misconduct alleged herein, Plaintiffs and the Class were not receiving services of the quality, nature, fitness, or value that had been represented by Defendant, and that a reasonable consumer would expect.

116.    Defendant has been unjustly enriched by its fraudulent and deceptive conduct and withholding of benefits to Plaintiffs and the Class, at the expense of these parties.

117.    Equity and good conscience militate against permitting Defendant to retain these profits and benefits.

**COUNT IV**
**BREACH OF CONTRACT**
**(On Behalf of All Plaintiffs and the Nationwide Class, or**
**Alternatively, the State Sub-Classes)**

118.    Plaintiffs repeat, reallege, and incorporate by reference each of the foregoing allegations as though fully set forth herein.

119.    As set forth herein, Plaintiffs and Defendant entered into contracts (*i.e.,* the Terms and Conditions).

120.    Plaintiffs have fully performed all material covenants, conditions and obligations that they were required to perform by reason of the contract, except to the extent waived, excused or made impossible by Defendant's breaches of the contract.

121.    The contracts provide that the consent of owners is not required for clerical or non-substantive amendments made by Defendant. As noted above, however, Section 21 of the contracts provides that owners may withhold their consent to the applicability of any substantive or non-clerical amendment (in which case the prior version of their contract will remain in effect).

122.    The addition of the traveler fees, in a new stand-alone provision added to the contracts beginning on February 9, 2016, was a substantive/non-clerical amendment made by Defendant.

123.    As noted above, Plaintiffs (such as Kirkpatrick) expressed their displeasure with the addition of the new traveler fees and made clear that they did not agree to them. Defendant nevertheless went ahead with its new business model and assessed them on owners.

124.    To the extent versions of any contract dated earlier than February 9, 2016 were in effect, they were silent as to traveler fees and did not authorize Defendant to assess them.

125.    Defendant's conduct materially breached the contracts, which had the direct and proximate effect of causing damages to Plaintiffs in an amount to be proven at trial, plus interest allowable under applicable law.

126.    Plaintiffs and the Class are entitled to an award of attorneys' fees pursuant to Chapter 38 of the Texas Civil Practice and Remedies Code.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs individually and on behalf of all others similarly situated, pray for relief and judgment against Defendant, as follows:

A.    For an order certifying the proposed class, appointing Plaintiffs and their counsel to represent the proposed class and notice to the proposed class to be paid by Defendant;

B.    For compensatory damages suffered by Plaintiffs and the proposed class, including loss of expected profits and/or loss of value of the contracts;

C.    For punitive damages and statutory additional damages under the DTPA, as Defendant's conduct was committed intentionally and/or knowingly;

D.    For restitution to Plaintiffs and the proposed class of all monies wrongfully obtained by Defendant;

E.    For injunctive relief requiring Defendant to cease and desist from engaging in the unlawful, unfair and/or deceptive practices alleged in the Complaint;

F.    An order awarding declaratory relief, retrospective and prospective injunctive relief as permitted by law or equity, including enjoining Defendant from continuing the unlawful practices as set forth herein, and injunctive relief to remedy Defendant's past conduct;

G.    For Plaintiffs' reasonable attorneys' fees, as permitted by law;

H.     For Plaintiff's costs incurred;

I.     For pre-judgment and post-judgment interest at the maximum allowable rate on any amounts awarded; and

J.     For such other and further relief that this Court deems just and proper under equity or law.

<u>**JURY DEMAND**</u>

Plaintiffs demand a trial by jury on all counts so triable.


Dated: September 7, 2017             Respectfully submitted,

By:    */s/ Benjamin F. Johns*
        Benjamin F. Johns (PA ID No. 201373)
        Andrew W. Ferich (PA ID No. 313696)
        Stephanie E. Saunders (PA ID No. 320481)
        CHIMICLES & TIKELLIS LLP
        361 W. Lancaster Avenue
        Haverford, PA  19041
        610-642-8500
        610-649-3633 (Fax)
        bfj@chimicles.com
        awf@chimicles.com
        ses@chimicles.com

        Michael Singley (TX ID No. 00794642)
        Edwards Law
        The Haehnel Building
        1101 E. 11th St.
        Austin, TX 78702
        512-623-7727

        Ketan U. Kharod (TX ID No. 24027105)
        KHAROD LAW FIRM, P.C.
        P.O. Box 151677
        Austin, TX 78715-1677
        512-293-1556
        512-852-4506 (Fax)
        ketan@kharodlawfirm.com

Jasper D. Ward IV
JONES WARD PLC
Marion E. Taylor Building
312 S. Fourth Street, 6th Floor
Louisville, Kentucky 40202
502-882-6000
502-587-2007 (Fax)
jasper@jonesward.com

Robert Adhoot
Theodore W. Maya
Bradley K. King
ADHOOT & WOLFSON, PC
1016 Palm Ave.
West Hollywood, California 90069
310-474-9111
310-474-8585 (Fax)
rahdoot@ahdootwolfson.com
tmaya@ahdootwolfson.com
bking@ahdootwolfson.com

*Counsel for Plaintiffs and the Putative Class*

**<u>CERTIFICATE OF SERVICE</u>**

I, Benjamin F. Johns, hereby certify that on this 7th day of September 2017, I filed a true

and correct copy of the above document with the Clerk of the Court in accordance with the Court's

Rules on Electronic Service, which caused notification of filing to be sent to all counsel of record.


                                   */s/ Benjamin F. Johns*
                                   Benjamin F. Johns